**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 15 2012

JAMES W. McCORMACK, CLERK
By:_____
                              DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

MARIAH GAYLER and
FREDA CRUSE PHILLIPS                                          PLAINTIFFS

V.                       NO. 1:12cv118-SWW

**(Removed from Case No. CV-2012-94-2,
Circuit Court of Stone County, Arkansas)**

MDOW INSURANCE COMPANY                                        DEFENDANT

<u>MDOW INSURANCE COMPANY'S NOTICE OF REMOVAL</u>

This case assigned to District Judge_____
and to Magistrate Judge_____

TO:   The United States District Court
      Eastern District of Arkansas, Northern Division

      Donna Wilson, Stone County Circuit Clerk
      107 W. Main Street, Mountain View AR 72560

      Kim Kelley, Kim Kelley P.A.
      104 N. Third Street, Heber Springs, AR 72543

COMES NOW Defendant, MDOW Insurance Company ("MDOW"), and hereby submits its Notice of Removal, as set forth below:

1.     Petitioner MDOW is the Defendant in a civil action brought against it in the Circuit Court of Stone County, Arkansas. *See* Complaint, attached as Exhibit 1.

2.     At the time of this filing and at all relevant times, Plaintiff Mariah Gayler was a resident of the State of California. Plaintiff Freda Cruse Phillips was at the time of this filing and at all times relevant a resident of Stone County, Arkansas.

3.     At all relevant times, MDOW was an insurance company incorporated under the laws of the State of Texas and authorized to do business in the State of Arkansas.

4.     The allegations complained of in the Complaint occurred in the Eastern District of Arkansas.

5.     Within thirty days before the filing of its Notice of Removal, Petitioner has ascertained based upon the Complaint that the aforementioned action is one which is removable under 28 U.S.C. § 1441.

6.     The amount in controversy in this action exceeds $75,000.00, exclusive of interest and costs, as set forth in Plaintiffs' Complaint.   *See* Exhibit 1.

7.     This action was commenced by service of summons on November 5, 2012.  This Notice is therefore timely filed under the provisions of 28 U.S.C. § 1441.

8.     Copies of all pleadings and orders filed or served upon Petitioner as Defendant in the aforementioned state action, as well as the Docket Sheet in the state action, are attached hereto, marked as Exhibits 1, 2 and 3 and made a part hereof.

WHEREFORE, Defendant hereby removes this case from the Circuit Court of Stone County, Arkansas to this court for determination and trial.

DATED this 15th day of November, 2012.

> MUNSON, ROWLETT, MOORE AND
>        BOONE, P.A.
> REGIONS CENTER
> 400 W. CAPITOL, SUITE 1900
> LITTLE ROCK, AR 72201
> 501/374-6535
> mark.breeding@hmrmlaw.com
>
> BY:_____
>        MARK S. BREEDING  / 89149

**DEMAND FOR JURY TRIAL**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Notice of Removal was forwarded this 15th day of November, 2012, to:

Kim Kelley
Kim Kelley P.A.
104 N. Third Street
Heber Springs, AR 72543

MARK S. BREEDING



**FILED**
IN STONE COUNTY, ARKANSAS

IN THE CIRCUIT COURT OF STONE COUNTY, ARKANSAS
2nd DIVISION

OCT 1 2 2012

AT 2:52 O'CLOCK ___ M.
BY ___ DONNA WILSON, CLERK
G.B.

MARIAH GAYLER and
FREDA CRUSE PHILLIPS

PLAINTIFFS

V.                                       CV-2012- 94-2

MDOW INSURANCE COMPANY                              DEFENDANT

JURY TRIAL DEMANDED

## COMPLAINT

Comes now the Plaintiffs, Mariah Gayler and Freda Cruse Phillips, by and through their

attorney, Kim Kelley, and for their complaint against Defendant states as follows:

*Parties, Jurisdiction, Venue*

1.      Mariah Gayler (Mariah) is the natural daughter of Freda Cruse Phillips, the owner of the

real property located in Stone County and insured by the contract for insurance at issue in this

suit (See Exhibit 1)(Policy), and the named insured on the insurance policy at issue in this suit.

Mariah is a legal resident of the State of California; however, she has strong ancestral and

property ties, including the second residence insured by the Policy, in Stone County.

2.      Freda Cruse Phillips (Freda)  is the natural mother of Mariah Gayler, was born and raised

in Mountain View, Arkansas, retains a life estate in the real property insured by the Policy, and is

currently a resident of Stone County, Arkansas.

3.      MDOW Insurance Company (MDOW) issued the Policy that is the subject of this suit;

MDOW is an insurance company authorized to do business and doing business in Stone County,

Arkansas.

4.      MDOW  is a wholly owned and 100% reinsured subsidiary of Columbia Lloyds

Company, a privately held company.



5.    Jurisdiction and venue are proper with this Court pursuant to Arkansas Code Annotated §§ 16-13-201, 16-56-111, and 23-79-204.

*Factual Background Ownership of Property and Household Relationships*

6.    While Freda was born and raised in Stone County, she obtained her PhD in social psychology from the University of California, San Diego.

7.    Her children were born in California; however, Freda purchased her first residence back home in Stone County in 1982 and moved home full time in 1988.

8.    The real estate insured by the Policy is located at the address 8030 Happy Hollow Road, Mountain View, AR 72560.

9.    Freda stayed on the property most of the time with Mariah staying in the home periodically.

10.    The property was not mortgaged in any way.

11.    In 2009, Freda experienced health issues that resulted in her being disabled.

12.    Freda's disability included her inability to properly care for her affairs.

13.    To ensure that her mother was properly cared for, Mariah and Freda combined Freda's household as a part of Mariah's household.

14.    In 2009, as a part of the restructuring of their household, Freda conveyed the real estate to Mariah subject to the retention of a life estate in Freda. (See Exhibit 2).

15.    The managing of her mother's affairs included a combining of resources in the joint ownership of Freda's real and personal property including bank accounts, furniture, clothing, daily incidentals, and the power and right of Mariah to make the decisions regarding the real and personal property.

16.     At all relevant times, Mariah was inherently present in the home at Happy Hollow with the vested right to make decisions regarding its care and use.

*Factual Background Regarding Purchase of Policy and Loss*

17.     In July 2010, Freda began dating Beau Hardison (Beau) and by May 2011, the two were discussing marriage.

18.     In May 2011, Mariah was in Stone County for her sister's, Freda's youngest daughter's, graduation from college.

19.     During the May visit, Mariah discussed with her mother and Beau the parties' potential marriage and the logistics of that new living arrangement.

20.     One of the concerns was the physical demands of maintaining the premises and the fact that there were days when Freda was unable to do much physical activity.

21.     The decision was made to sell the residence at Happy Hollow on a rent-to-own or an owner finance basis and find a new home with fewer day to day physical demands for maintenance.

22.     The sale would allow additional income for the care of Freda and a change of residence with fewer physical demands was appropriate.

23.     Mariah and Freda listed the Happy Hollow residence on Ebay Real Estate for $149,000 with bidding for the right to buy the house.

24.     A winning bidder obtained the right to purchase the house on a Contract for Deed.

25.     Under the terms of purchase, Freda and Mariah would have received approximately $360,000 over the thirty (30) year term.

26.     In the meantime, Freda and Beau with Mariah had found another home to purchase.

27.     The plan was to purchase the new home with a bank loan.

28.     To obtain a bank loan for the new home, the bank required that the property at Happy Hollow be used as security.

29.     Until this time, Freda and Mariah's home was not insured for loss.

30.     The bank required that the Happy Hollow property, which would be used as security for the new home, be insured against loss.

31.     The insurance policy was purchased with Mariah as the named insured, the premium was paid, and the policy was effective June 28, 2011 through June 28, 2012.

32.     The Policy's limits of liability for the residence is $150,000 with a $1,000 deductible. (See Exhibit 1, p. 1).

33.     The Policy's limits of liability for the personal property is $20,000 with no deductible. (See Exhibit 1, p. 1).

34.     The policy insures against the peril of fire. (See Exhibit 1, p. 9).

35.     The home was destroyed by fire on July 6, 2012.

*Factual Background Regarding Breach of Contract and Bad Faith*

36.     The local fire department responded to the fire.

37.     The local fire department did not suspect arson as the cause of the fire.

38.     Mariah and Freda made a claim for loss to Defendants and all conditions precedent to their claim being paid have occurred.

39.     After the claim was made, Defendants performed their own investigation.

40.     The Defendant's investigator said that the fire was incendiary in nature.

41.     After Defendant's investigator said the fire was caused by arson, the local authorities questioned Freda regarding the cause of the fire.

42.     As a part of the investigation, Freda agreed to take a polygraph.

43.     The results of the polygraph were that Freda was being truthful when she said that she did not cause her house to burn and that she had no knowledge of who caused her house to burn.

44.     Freda and Mariah actually believe that no one caused the fire and that the fire was not arson.

45.     As a part of their investigation, Defendant took the deposition of Freda.

46.     Through the deposition of Freda and their investigation, the Defendant has no good-faith basis to assert that Freda or Mariah had any incentive to cause the destruction of their home by fire nor that they in fact caused the fire that destroyed their home.

47.     The loss of their home caused them to lose approximately $360,000 in future income because they were unable to complete the sale of the home.

48.     The loss of their home caused them to lose other opportunities.

49.     The loss of their home combined with the failure of Defendants to pay the claim caused them to lose the opportunity of purchasing a new home well-suited to their situation and to lose other opportunities.

50.     The loss of their home combined with the failure of Defendants to pay the claim caused them financial hardship including additional living expenses and stress.

51.     Stress significantly and negatively impacts Freda with her disability.

52.     MDOW has only been writing insurance since 2008.

53.     MDOW is currently writing insurance in two states:  Arkansas and Oklahoma.

54.     In November 2010, A.M. Best Co. downgraded the financial strength rating to A-(Excellent) from A (Excellent) and issuer credit rating to "a-" from "a" of Columbia Lloyds Companies and its members.

55.     Best's Financial Strength Ratings provide an independent third-party evaluation to help determine the ability of an insurer to fulfill its financial obligations with regard to life, homeowners and other insurance products to a policyholder.

56.     Insurance agents, brokers, financial advisors, banks and other insurance professionals utilize Best's Financial Strength Ratings to help support their insurance carrier selection and investment decisions.

57.     In recent years, ratings have also become increasingly important in helping consumers themselves make decisions on which insurers to buy coverage from, whether it is to protect their lifestyle or their future financial well being.

58.     These downgraded ratings applied to Columbia Lloyds Insurance Company (Houston, TX) and its wholly owned and 100% reinsured subsidiary, MDOW Insurance Company (MDOW).

59.     The outlook for all ratings was revised to negative from stable.

60.     The rating actions reflected Columbia Lloyds Companies' recent underwriting deterioration and loss of surplus as a result of the significant number of lawsuits recently filed against the group, stemming from Hurricane Ike.

61.     As a property writer with most of its business risks concentrated in Texas when the hurricane occurred, the group was subjected to weather-related activity and strong competition.

62.     While MDOW's entrance into new states had expanded Columbia Lloyds Companies' market presence outside of Texas, exposure to additional weather-related exposures remained.

63.     For instance, weather-related losses in 2010 in Oklahoma, combined with aggressive growth trends, further pressured the group's risk-adjusted capital position.

64.     The negative outlook reflected the recent operational challenges faced by the group with respect to continued adverse development on Hurricane Ike claims and reinsurance dependence with resulting pressure on the group's capital position.

65.     Somewhat offsetting these negative rating factors were Columbia Lloyds Companies' generally favorable risk-adjusted capitalization, conservative investment strategy and local market knowledge.

66.     Furthermore, the ratings reflected the group's expertise in providing coverages for low value dwellings primarily in Texas, with further expansion occurring in neighboring states with MDOW.

67.     In 2011, MDOW's marketing of insurance in Arkansas for low value dwellings, and an increase in market share, was a critical strategy to the overall financial strength of Columbia Lloyds Company and its groups.

68.     In 2011, MDOW's ability to produce a profit on the insurance in Arkansas for low value dwellings was critical to stabilizing the outlook for all ratings of Columbia Lloyds Company and its groups.

69.     One aspect of increasing profit is increasing market share.

70.     In 2011, MDOW's market share for Arkansas increased from .23% in 2010 to .49% in 2011.

71.     In 2011, the number of direct written premiums increased to $3,448,663.00 from $1,518,365.00 in 2010.

72.     In 2012, MDOW requested an increase in its rates effective June 1, 2012 in the State of Arkansas.

73.     The change in the rates was due to an analysis of the loss experience that indicated a need for a 105.0% increase.

74.     Despite the need of a 105.0% increase, MDOW moderated the request due to considerations that included a desire to be competitive in order to write more policies in the State of Arkansas.

75.     The moderated request was an increase of 40.00% in the rates.

76.     MDOW has an incentive to underpay and delay payment of claims.

77.     Demands have been made to MDOW to pay the claim pursuant to the Policy; however, MDOW has refused to pay and has denied the claim. As a result of its denial, it has become necessary for Mariah and Freda to obtain legal representation and file this pleading in an effort to enforce their legal rights under the contract.  MDOW's actions were intended to underpay and delay payment of this claim.

*Causes of Action*

## COUNT I: BREACH OF CONTRACT

78.     Plaintiffs incorporate paragraphs 1 through 77  by reference.

79.     At the time that the residence in Happy Hollow was destroyed, Mariah was a named insured on the policy of insurance.

80.     MDOW has refused to pay the claim.

81.     The amount of insurance available under the policy terms is $150,000 for the residence and $20,000 for the personal property.

82.     MDOW has failed to comply with the terms of the Policy, and there is no legal basis for MDOW'S continued failure to comply with the terms of the Policy.

## COUNT II: TORT OF BAD FAITH

83.    Plaintiffs incorporate by reference paragraphs 1 through 82.

84.    At all times relevant herein, MDOW had a duty and agreement to act in good faith and fairly with Mariah and Freda when it entered into a contractual agreement and named Mariah as a named insured and accepted premium payments. MDOW assumed a special relationship and fiduciary obligation to Mariah and Freda and agreed to abide by its respective duties.

85.    MDOW intentionally breached these duties by engaging in dishonest, oppressive acts in an attempt to underpay and delay payment under the terms of the Policy.

86.    MDOW engaged in dishonest and oppressive conduct by, among other things, consciously disregarding or turning a blind eye to clear evidence of the claim.

87.    MDOW engaged in dishonest and oppressive conduct by, among other things, placing Mariah and Freda in a position to seek legal redress and incur attorney's fees and costs.  By consciously disregarding or turning a blind eye to clear evidence, MDOW, knowing it had no legal justification for doing so, purposely forced Mariah and Freda to file this pleading in order to obtain insurance proceeds to which they are entitled.

88.    MDOW engaged in dishonest and oppressive conduct by failing to pay the claim for over a year, placing economic hardship on Mariah and Freda.

89.    MDOW has engaged, in the course of their dealing with Mariah and Freda, in a pattern of deception and unfair practices.  This dishonest and oppressive behavior constitutes bad faith under Arkansas law.

## COUNT III: ATTORNEY'S FEES AND 12% DAMAGES

90.    Plaintiffs incorporate paragraphs 1-90 by reference.

91.     Mariah and Freda seek an award of attorney's fees and costs incurred in this litigation pursuant to Arkansas Code Annotated § 16-22-308.

92.     Section 23-79-208 of Arkansas Code Annotated provides for damages and attorney's fees on loss claims that are not timely paid.  Accordingly, Mariah and Freda request attorney's fees be paid of which is a one-third contingency fee, plus 12% damages on the amount of the loss.

## JURY DEMAND

93.     Mariah and Freda request a jury trial on all triable issues.

## PRAYER

WHEREFORE, Plaintiffs ask this Court to enter judgment against MDOW in the amount exceeding the minimum jurisdiction requirements for diversity of citizenship cases in federal court, for a trial by jury, for attorney's fees and costs expended herein pursuant to Arkansas Code Annotated § 16-22-308, plus 12% damages on the amount of the loss, and for all other just and proper relief to which they may be entitled.

Respectfully submitted,

Attorney for Plaintiffs
Kim Kelley P.A.
Kim Kelley # 92187
104 N. Third St.
Heber Springs, AR 72543
Phone: (501) 365-3930
Fax: (501) 250-0293
Kim.Kelley.Law@gmail.com

# ARKANSAS DWELLING POLICY- FORM FL-1

DECLARATIONS PAGE

## *MDOW Insurance Company*

PO BOX 540548 / Houston, Texas 77254/ (866) 837-4668

| POLICY NUMBER | | |
|---|---|---|
| ARP_F116147-11 | [X] NEW  [ ] AMENDED EFFECTIVE | [ ] RENEWAL |

| NAMED INSURED MAILING ADDRESS | AGENT'S NAME ADDRESS PHONE NUMBER |
|---|---|
| MARIAH GAYLER<br>P O BOX 2133<br>MOUNTAIN VIEW AR 72560 | STONE COUNTY INSURANCE AGENCY    (870) 269-9944<br>2013 EAST MAIN ST.<br>MOUNTAIN VIEW, AR 72560 |

**POLICY PERIOD EFFECTIVE DATE:**      06-28-2011            **EXPIRATION DATE:**      06-28-2012
AT 12:01 A.M. STANDARD TIME AT THE LOCATION OF DESCRIBED PROPERTY

**LOCATION OF PROPERTY**
8030 HAPPY HOLLOW ROAD
MOUNTAIN VIEW, AR 72560

| ROOF TYPE | CONSTRUCTION | INSURED AMOUNT | OCCUPANCY |
|---|---|---|---|
| COMPOSITION SHINGLE | FRAME | | OWNER |

| COVERAGE | DEDUCTIBLE | LIMITS OF LIABILITY | DESCRIPTION OF COVERAGE |
|---|---|---|---|
| A | $1,000 | $150,000 | RESIDENCE |
| C | | $20,000 | PERSONAL PROPERTY |

| PERILS INSURED AGAINST | PREMIUM |
|---|---|
| FIRE OR LIGHTNING; EXPLOSION | $398.00 |
| WINDSTORM OR HAIL; RIOT OR CIVIL COMMOTION;AIRCRAFT;VEHICLES;SMOKE;VOLCANIC ACTION;SINKHOLE COLLAPSE;VANDALISM | $280.00 |

| ADDITIONAL ENDORSEMENTS ATTACHED TO POLICY | |
|---|---|
| **TOTAL POLICY PREMIUM** | $678.00 |

MORTGAGEE

OTHER COVERAGES, LIMITS AND EXCLUSIONS APPLY- REFER TO YOUR POLICY
INSURED COPY

## EXHIBIT 1

**AAIS**
**CL-300  Ed 1.0**
**Page 1 of 1**

# AMENDATORY ENDORSEMENT

The reference to words that have special meaning is deleted and replaced by the following:

Refer to Definitions for words and phrases that have special meaning. These words and phrases are shown in quotation marks or bold type.

**CL-300  Ed 1.0**

Copyright MCMXCIV, American Association of Insurance Services

**EXHIBIT 1**                                                                 **2**

## Declination of Residential Earthquake Coverage

I have been advised about the availability of residential earthquake insurance through the Market Assistance Program (MAP) and/or the Arkansas Earthquake Authority and/or the insurance company to which I am applying.

I hereby choose <u>NOT</u> to purchase earthquake coverage in any form, from any of the above sources.

_____

| Applicant's Signature | Date |

EXHIBIT 1                                    3

## NOTICE TO POLICYHOLDERS

The possibility of a major earthquake occurring in the state poses a serious threat to citizens of Arkansas. Most homeowner (including renter and condominium owners), farmowner and dwelling fire policies do not provide earthquake coverage or may provide less than 100% coverage for damage due to an earthquake. You should review your policy or talk with your agent to determine whether you have earthquake coverage.

The market for residential earthquake coverage in Arkansas has declined over the past several years. In response to these market conditions, a Market Assistance Program (MAP) has been developed to assist consumers in obtaining residential earthquake coverage. Individuals qualify to purchase residential earthquake coverage through the MAP simply by having underlying homeowners, farmowners or dwelling fire coverage that excludes the earthquake peril.

A list of insurers participating in the MAP may be obtained by contacting your agent or calling 1-800-852-5494. You may also elect to maintain earthquake coverage which you may have already purchased.

This notice does not provide you with earthquake coverage nor does it increase any amounts of earthquake coverage you may have.

EXHIBIT 1                                                   4

# DWELLING FIRE POLICY
# FL - 1



MDOW INSURANCE COMPANY
PO BOX 540548
HOUSTON, TX 77254
(866) 837· 4668
www.mdowinsurance.com

MDOW DWF FL-1
(11/07)

**EXHIBIT 1**

5

**BASIC FORM**

The following Table of Contents shows how the policy is organized. It will help **you** locate particular sections of the policy.

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Agreement | 1 |
| Definitions | 2 |
| Principal Coverages | 2 |
| Incidental Coverages | 4 |
| Perils Insured Against – Coverages A, B, C, and D | 5 |
| General Exclusions | 6 |
| What **You** Must Do in Case of Loss | 7 |
| How Much **We** Pay for Loss or Claim | 8 |
| Payment of Loss | 9 |
| Policy Conditions | 9 |
| Farm Coverages (when applicable) | Separate Forms |

Required state endorsements may also be part of this policy.

Refer to the Definitions for words that have special meaning. These words are shown in **"bold type"**.

**AGREEMENT**

This policy, subject to all of its **terms**, provides property insurance and other described coverages during the policy period. In return **you** must pay the **required premium**. Each of the Principal Coverages described in this policy applies only if a **limit** is shown on the Declarations for that coverage.

1

**EXHIBIT 1**                                                    **6**

## DEFINITIONS

1. The words **you** and **your** mean the person or persons named on the Declarations and **your** spouse if a resident of **your** household. The words **we**, **us**, and **our** mean the company providing this insurance.

2. **Business** means a trade, profession, or occupation including farming, all whether full or part time.

3. **Credit Card** means a card, plate, coupon book, or other credit device used to obtain money, property, labor, or services on credit. This includes debit cards or fund transfer cards used to deposit, withdraw or transfer funds.

4. **Insured Premises** means the location shown on the Declarations.

5. **Limit** means the limit of liability that applies.

6. **Motorized Vehicle** means a self-propelled land or amphibious vehicle regardless of method of surface contact.

7. **Pollutant** means any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, or waste. Waste includes materials to be disposed of, recycled, reconditioned, or reclaimed.

8. **Terms** means all provisions, limitations, exclusions, conditions, and definitions used in this policy.

## PRINCIPAL COVERAGES

### Coverage A – Residence

1. **We** cover the residence on the **insured premises**, including its additions, built-in components, and attached fixtures. On the **insured premises**, **we** also cover:

   a. building items that can be detached from the covered residence, such as screens and storm doors;

   b. appliances, carpets, and window coverings in that part of the residence **you** rent to others;

   c. building materials and supplies for use in construction on the **insured premises**; and

   d. if this policy does not provide Coverage C, tools and equipment used to service the **insured premises**. This includes **motorized vehicles** used only to service the **insured premises** that are not required to be licensed for road use.

2. Coverage A does not cover:

   a. land, including the land on which the property is located, underground water or surface water;

   b. trees, plants, shrubs, and lawns; and

   c. farm tools, farm equipment, and farm **motorized vehicles**.

### Coverage B – Related Private Structures

1. **We** cover related private structures on the **insured premises** which are not attached to the residence, including their additions, built-in components, and attached fixtures. Structures that are connected to the residence by only a fence, a utility line, or a similar connection are not considered attached. On the **insured premises**, **we** also cover:

   a. fences, driveways, and sidewalks;

   b. other permanently installed outdoor fixtures; and

   c. building items that can be detached from covered related private structures, such as screens and storm doors.

2. Coverage B does not cover:

   a. land, including the land on which the property is located, underground water or surface water;

   b. trees, plants, shrubs, and lawns;

   c. structures used for **business**; and

   d. structures rented or held for rental. This does not apply to structures:

      1) rented or held for rental to a tenant of the covered residence and not used for **business** by the tenant; or

      2) used solely as a private garage.

2

### EXHIBIT 1                                                    7

**Coverage C – Personal Property**

1. **While on the Insured Premises –** This policy covers personal property, while on the **insured premises**, which is usual to the occupancy of the dwelling as a residence. The personal property must be owned or used by **you** or **your** family members who reside with **you**.

2. **While Away from the Insured Premises – You** may apply up to 10 percent of the Coverage C limit to cover personal property, while away from the **insured premises**, which is usual to the occupancy of the dwelling as a residence. The personal property must be owned or used by **you**, or **your** family members who reside with **you**.

3. **While in a Newly Acquired Principal Residence – We** pay for loss to covered personal property in a newly acquired principal residence. The full Coverage C limit applies for 30 days from the date **you** begin to move. After that, coverage for personal property in a newly acquired principal residence is limited to 10 percent of the Coverage C limit. This coverage does not extend past the date on which the policy expires or the date on which the policy is terminated.

4. **Property of Others – At your** option, personal property owned by a guest or domestic employee is covered while it is in that part of the **insured premises** occupied by **you**.

5. **Limitations on Certain Property –** The special limits shown below do not increase the Coverage C limit. The limit for each class is the total limit per occurrence for all items in that class.

   a. $200 on money, bank notes, bullion, gold other than goldware and gold-plated ware, silver other than silverware and silver-plated ware, platinum, coins, and numismatic prop-erty.

   b. Regardless of their storage medium, $1,000 on securities, bills, letters of credit, notes other than bank notes, tickets, accounts, deeds, evidence of debt, passports, manuscripts, stamps, and philatelic property.

   c. $1,000 on watercraft including their trailers, furnishings, equipment, and motors.

   d. **Business** property, up to the amounts shown below:
      1) $2,500 while on the **insured premises**;
      2) $250 while away from the **insured premises**.

   e. $1,000 on trailers not otherwise provided for.

6. **Personal Property Not Covered –** Coverage C does not cover:

   a. land, including the land on which the property is located, underground water or surface water;

   b. trees, plants, shrubs, and lawns;

   c. animals, birds, fish, or insects;

   d. **motorized vehicles.** This includes their parts, equipment, and accessories while in or on a **motorized vehicle. We** do cover **motor-ized vehicles** that are not subject to motor vehicle registration if they are designed and used to assist the handicapped or used only to service the **insured premises**;

   e. aircraft, including their parts and equipment;

   f. electronic devices, accessories, or antennas that may be operated from the electrical system of a **motorized vehicle**, farm equipment, or watercraft while in or on the **motorized vehicle**, farm equipment, or watercraft. This includes films, tapes, wires, discs, records, or other media for use with such devices;

   g. loss that results from **credit cards**; or

   h. farm property.

**Coverage D – Additional Living Costs and Fair Rental Value**

**We** pay the necessary and reasonable increase in living costs **you** incur to maintain the normal stan-dard of living of **your** household if the part of the **insured premises** containing **your** household is made unfit for use by an insured loss. **We** pay only for the period of time reasonably required to make that part of the **insured premises** containing **your** household fit for use or to settle **your** household in new quarters, whichever is less. This period of time is not limited by the policy period.

**We** pay for the fair rental value if the part of the **insured premises** rented or held for rental to others is made unfit for use by an insured loss. **We** only

3

**EXHIBIT 1**                                            8

pay for the period of time reasonably required to make that part of the **insured premises** rented or held for rental to others fit for use. Fair rental value is the amount **you** would have received less the charges and expenses that do not continue while the **insured premises** is unfit for use. This period of time is not limited by the policy period.

**We** pay **your** additional living costs and fair rental value for up to two weeks if the premises next to the **insured premises** is damaged by a peril insured against and **you** may not, by order of civil authority, use the **insured premises**. This period of time is not limited by the policy period.

**We** do not pay for additional living costs or fair rental value due to the cancellation of a lease or an agreement.

## INCIDENTAL COVERAGES

This policy provides the following incidental Coverages. They are subject to all of the **terms** of the applicable Coverages A, B, or C. They are not extended to farm property. These coverages provide additional insurance unless otherwise stated.

1. **Emergency Removal** — **We** pay for loss to covered property that is moved to prevent loss by a peril insured against. The property is covered for direct physical loss not excluded, for up to 30 days. This coverage does not extend past the date on which this policy terminates.

   **We** pay up to a $250 towing charge to move a covered mobile home that is in danger from a peril insured against.

   This coverage does not increase the limits shown for the property being removed.

2. **Debris Removal** — **We** pay for the cost to remove the debris of covered property after an insured loss. This includes the cost to remove volcanic ash, dust, or particulate matter that causes direct physical loss to covered property.

   **You** may apply up to 25% of the **limit** that applies to the damaged property to cover debris removal. **We** will not pay more for direct loss to property and debris removal combined than the **limit** that applies to the damaged property. However, when the covered loss plus the cost of debris removal is more than the applicable **limit**, **we** will pay up to an extra 5% of the applicable **limit** to cover the cost of debris removal.

   This coverage does not include costs to extract **pollutants** from land or water; or remove, restore, or replace polluted land or water.

   **We** also pay the cost to remove fallen trees which cause damage to property covered under Coverages A, B, or C if:

   a. the falling of the tree is caused by any of the perils insured against; and

   b. coverage is not provided elsewhere by this policy.

   Regardless of the number of fallen trees, the most **we** will pay is $500 per occurrence.

3. **Trees, Plants, Shrubs, or Lawns** — **We** pay for loss to trees, plants, shrubs, or lawns on the **insured premises** caused by:

   a. fire or lightning, explosion, riot or civil commotion, aircraft;

   b. vehicles, if not owned or operated by **you** or an occupant of the **insured premises**; or

   c. if covered by this policy, vandalism or theft.

   **We** do not cover trees, plants, shrubs, or lawns grown for **business**.

   **You** may apply up to 5 percent of the Coverage A **limit** on the **insured premises** to cover trees, plants, shrubs, or lawns. **We** do not pay more than $500 for each tree, plant, or shrub. This includes the cost to remove the debris of the covered item.

4. **Fire Department Service Charge** — **We** pay up to $500 for charges assumed by **you** under a contract or agreement when a fire department is called to protect covered property from a peril insured against.

5. **Tenant's Improvements** — If **you** are a tenant, we pay for loss by perils insured against to improvements on the **insured premises** made or acquired at **your** expense. These are permanent fixtures, alterations, decorations, and additions.

   **You** may apply up to 10 percent of the Coverage C **limit** to cover tenant's improvements.

4

**EXHIBIT 1**                                                    9

## PERILS INSURED AGAINST -- COVERAGES A, B, C, AND D

**PERILS INSURED AGAINST -- COVERAGES A, B, C, AND D**

We insure against direct physical loss caused by the following perils, unless the loss is excluded under the General Exclusions:

1. **Fire or Lightning**

2. **Explosion**

**Optional Perils -- Extended Coverage --** The following perils (Numbers 3 through 9) are subject to an additional premium charge and apply only if coverage for Extended Coverage is shown on the Declarations.

3. **Windstorm or Hail** -- However, we do not pay for loss:

    a. to the interior of a building or mobile home, or to property inside a structure caused by dust, rain, sand, sleet, snow or water, all whether driven by wind or not, which enter through an opening not made by the direct force of wind or hail;

    b. to watercraft and their trailers, furnishings, equipment and motors unless inside a fully enclosed building. (**We** do cover canoes and rowboats while on the **insured premises**.); or

    c. to outdoor antennas, including their lead-in wiring, masts and towers.

4. **Riot or Civil Commotion**

5. **Aircraft** -- This means direct loss from actual physical contact of an aircraft with covered property and includes objects falling from aircraft.

6. **Vehicles** -- However, **we** do not pay for loss to fences, driveways and walks caused by a vehicle owned or operated by **you** or an occupant of the **insured premises.**

7. **Sudden and Accidental Damage from Smoke** -- However, **we** do not pay for loss caused by smoke from agricultural smudging or industrial operations.

8. **Sinkhole Collapse** -- This means loss caused by sudden settlement or collapse of earth supporting covered property. The earth settlement or collapse must result from subterranean voids created by the action of water on a limestone or similar rock formation.

    However, **we** do not cover the value of land or the cost of filling sinkholes.

9. **Volcanic Action** -- This means:

    a. airborne volcanic blast or airborne shock waves;

    b. ash, dust, or particulate matter; or

    c. lava flow.

    However, **we** do not cover removal of ash, dust, or particulate matter that does not cause direct physical loss to covered property.

**Optional Peril -- Vandalism** -- This peril (Number 10) is subject to an additional premium charge and applies only if coverage for Vandalism is shown on the Declarations.

10. **Vandalism** -- However, **we** do not pay for loss on the **insured premises** if the residence is vacant for more than 30 days in a row just before the loss. A residence being built is not vacant.

5

EXHIBIT 1                          10

## GENERAL EXCLUSIONS

We do not pay for loss if one or more of the following exclusions apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

1. **Business Interruption — We** do not pay for loss which results from interruption of **business.**

2. **Civil Authority — We** do not pay for a loss which results from order of civil authority.

   **We** pay for loss which results from acts of a civil authority to prevent the spread of fire. **We** do not pay if the fire was caused by an excluded peril.

3. **Earth Movement — We** do not pay for loss which results from earth movement whether the earth movement results from natural or artificial causes.

   Earth movement includes but is not limited to:

   a. earthquake;

   b. landslide, subsidence, erosion;

   c. mudflow;

   d. earth sinking, rising, shifting, expanding, or contracting. This does not include Sinkhole Collapse as described under Perils Insured Against; or

   e. volcanic explosion. Volcanic explosion does not include Volcanic Action as described under Perils Insured Against.

   **We** do pay for direct loss caused by fire, explosion (other than a volcanic explosion) and, if covered by this policy, theft resulting from earth movement.

4. **Intentional Acts — We** do not pay for loss which results from an act committed with intent to cause a loss:

   a. by **you** or at **your** direction; or

   b. by or at the direction of any other insured.

5. **Neglect — We** do not pay for loss which results from **your** neglect to use all reasonable means to save and preserve covered property at and after the time of a loss.

6. **Nuclear Hazard — We** do not pay for loss which results from nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by, contributed to or aggravated by a peril insured against and whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct loss by fire resulting from the nuclear hazard is covered.

7. **Ordinance or Law — We** do not pay for loss or increased cost which results from the enforcement of a code, ordinance, or law which regulates the use, construction, repair, demolition of property, or removal of its debris.

8. **Power Disruption — We** do not pay for loss which results from the disruption of power or other utility service, whether or not it is caused by a peril insured against, if the cause of the disruption is not on the **insured premises**.

   **We** do pay for direct loss by a peril insured against which occurs on the **insured premises** as a result of the disruption of power.

9. **War — We** do not pay for loss which results from declared or undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, or destruction, seizure, or use of property for a military purpose. It includes the consequences of these. Discharge of a nuclear weapon is deemed an act of war even if it is accidental.

10. **Water Damage — We** do not pay for loss which results from the following:

    a. flood, surface water, waves, tidal water, overflow of a body of water, or spray, all whether driven by wind or not;

    b. water which backs up through or overflows from sewers, drains, or sumps; or

    c. water below the surface of the ground. This includes water which exerts pressure on, or seeps or leaks through or into a building, sidewalk, driveway, foundation, swimming pool, or other structure.

    **We** pay for direct loss caused by fire; explosion (other than a volcanic explosion); and, if covered by this policy, theft resulting from water damage.

6

**EXHIBIT 1**                                      **11**

11. **Wear and Tear — We** do not pay for loss which results from wear and tear, marring, deterioration, inherent vice, latent defect, mechanical breakdown, rust, wet or dry rot, corrosion, mold, contamination, or smog. **We** do pay for an ensuing loss unless the ensuing loss itself is excluded.

12. **Weather Conditions — We** do not pay for loss which results from weather conditions that initiate, set in motion, or in any way contribute to losses excluded under the preceding General Exclusions (Numbers 1 through 11).

    **We** do pay for an ensuing loss unless the ensuing loss itself is excluded.

13. **Errors, Omissions, and Defects — We** do not pay for loss which results from one or more of the following:

a. an act, error, or omission (negligent or not) relating to:

   1) land use;
   2) the design, specification, construction, workmanship, or installation of property;
   3) planning, zoning, development, surveying, siting, grading, compaction; or
   4) maintenance of property (including land, structures, or improvements);

   whether on or off the **insured premises**;

b. a defect, a weakness, the inadequacy, a fault, or unsoundness in materials used in construction or repair whether on or off the **insured premises**.

   **We** do pay for an ensuing loss unless the ensuing loss itself is excluded.

## WHAT YOU MUST DO IN CASE OF LOSS

1. **Notice —** In case of a loss, **you** must:

   a. give **us** or **our** agent prompt notice (**We** may request written notice); and

   b. give notice to the police when the act that causes the loss is a crime.

   The notice to **us** must state:

   a. **your** name, the policy number and the time, place, and the details of the loss; and

   b. the names and addresses of all known potential claimants and witnesses.

2. **Cooperation — You** must cooperate with **us** in investigating and settling the claim.

3. **Volunteer Payments — You** must not make payments, pay or offer rewards or assume obligations or other costs, except at **your** own cost. This does not apply to costs that are allowed by this policy.

4. **Other Duties — You** must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss. **We** will pay the reasonable costs incurred by **you** for necessary repairs or emergency measures performed solely to protect covered property from further damage by a peril insured against if a peril insured against has already caused a loss to covered property. **You** must keep an accurate record of such costs. However, **we** will not pay for such repairs or emergency measures performed on property which has not been damaged by a peril insured against. This does not increase **our limit**.

At **our** request **you** must:

a. give **us** a signed, sworn proof of loss, within 60 days after **our** request, that shows:

   1) the time, place, and the details of the loss;
   2) **your** interest and the interest of all others in the property. This includes all mortgages and liens;
   3) other policies that may cover the loss;
   4) changes in title or use;
   5) available plans and specifications of buildings;
   6) detailed estimates for repair; and
   7) in detail, the quantity, description, cost, amount of loss, and actual cash value of the personal property involved in the loss. **You** must give **us** copies of all bills, receipts, and related documents to confirm these;

## EXHIBIT 1                    12

b. submit to examination under oath in matters that relate to the loss or claim as often as **we** reasonably request. If more than one person is examined, **we** have the right to examine and receive statements separately from each person and not in the presence of the others;

c. show the damaged property and allow **us** to take samples of damaged property for inspection, testing, and analysis as often as **we** reasonably request;

d. show records, including tax returns and bank records of all canceled checks that relate to

the value, loss, and costs, and permit copies to be made of them as often as **we** reasonably request;

e. assist **us** to enforce any right of recovery which **you** may have against a party causing the loss; and

f. show records that prove loss of rents and show receipts for additional living costs, and permit copies to be made of them as often as **we** reasonably request.

## HOW MUCH WE PAY FOR LOSS OR CLAIM

**Loss Settlement Terms** — Subject to the deductible or other limitation that applies, **we** pay the lesser of:

a) the limit that applies;
b) **your** interest in the property; or
c) the amount determined under the Actual Cash Value Terms.

1. **Actual Cash Value Terms** — Actual cash value includes a deduction for depreciation, however caused. The smallest of the following amounts is used in applying the Loss Settlement Terms:

   a. the cost to repair or replace the property with materials of like kind and quality to the extent practical;

   b. the actual cash value of the property at the time of loss; or

   c. (applies only to mobile homes) the difference in the actual cash value just before the loss and the actual cash value just after the loss.

2. **Deductible** — This applies to Coverages A, B, and C; Debris Removal; Trees, Plants, Shrubs and Lawns; and Tenant's Improvements. It applies to all perils insured against unless otherwise shown.

**We** pay that part of the loss over the deductible. Not more than one deductible applies per occurrence. If this policy covers more than one residence, the deductible applies separately to each residence.

3. **Loss to a Pair or Set** — If there is loss to an item which is part of a pair or set, **we** pay only to replace or repair the item, or **we** pay the difference in the actual cash value of the pair or set just before the loss and the actual cash value just after the loss.

4. **Insurance Under More Than One Coverage** — If more than one coverage of this policy applies to a loss, **we** pay no more than the actual loss.

5. **Insurance Under More Than One Policy** — If there is other insurance that applies to the loss, **we** pay **our** share of the loss. **Our** share is that part of the loss that the limit of this policy bears to the total amount of insurance that applies to the loss. When a loss is also covered by the master policy of an association or corporation of property owners, this insurance is excess.

6. **Restoration of Limits** — Each loss **we** pay under this policy does not reduce the limits available over the policy term.

8

**EXHIBIT 1**                    13

## PAYMENT OF LOSS

1. **Your Property** -- **We** adjust each loss with **you**. **We** pay an insured loss within 30 days after an acceptable proof of loss is received and the amount of the loss is agreed to in writing. If **you** and **we** do not agree, **we** pay within 30 days after the filing of an appraisal award with **us**. Payment is made to **you** unless a loss payee is named.

2. **Additional Living Costs** -- If the **insured premises** is unfit for use for more than one month, covered costs are paid on a monthly basis. **You** must give **us** proof of such costs.

3. **Damage to Personal Property of Others** -- At **our** option, an insured loss may be adjusted with and paid:

   a. to **you** on behalf of the owner; or

   b. to the owner. If **we** pay the owner, **we** do not have to pay **you**.

4. **Our Options** -- **We** may:

   a. pay the loss in money; or

   b. rebuild, repair or replace the property. **We** must give **you** notice of **our** intent to do so within 30 days after **we** receive an accept-able proof of loss.

   **We** may take all or part of the damaged property at the agreed or appraised value. Property paid for or replaced by **us** becomes **ours**.

## POLICY CONDITIONS

1. **Abandonment of Property** -- **You** may not abandon the property to us unless **we** agree.

2. **Appraisal** -- If **you** and **we** do not agree on the amount of the loss, the actual cash value of the property or the cost to repair or replace the property, either party may demand that these amounts be determined by appraisal.

   If either party makes a written demand for appraisal, each will select a competent independent appraiser and notify the other of the appraiser's identity within 20 days after the receipt of the written demand. The two appraisers will select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, **you** or **we** can ask a judge of a court of record in the state where the property is located to select an umpire.

   For each building item and each item of personal property, the appraisers will determine:

   a. the amount of the loss;

   b. the actual cash value of the property; and

   c. the cost to repair or replace the property.

   Each amount will be stated separately.

   If the appraisers submit a written report of an agreement to **us**, the agreement will establish these amounts. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. A written agreement by two of these three will establish the amounts stated above.

   Each appraiser will be paid by the party selecting that appraiser. The compensation of the umpire and other costs of the appraisal will be shared equally by **you** and **us**.

   If **we** make the written demand for an appraisal, **we** will pay:

   a. the reasonable and necessary cost for **your** appraiser; and

   b. **your** share of the cost for the umpire.

3. **Assignment** -- This policy may not be assigned without **our** written consent.

9

**EXHIBIT 1**

14

4. **Cancellation and Nonrenewal — You** may cancel this policy by returning the policy to **us** or by giving **us** written notice and stating at what future date coverage is to stop.

**We** may cancel or not renew this policy by written notice to **you** at the address shown on the Declarations. Proof of delivery or mailing is sufficient proof of notice.

During the first 60 days this policy is in effect, **we** may cancel for any reason.

After this policy has been in effect 60 days or more, or if it is a renewal of a policy issued by **us**, **we** may cancel or not renew only at the anniversary date unless:

a. the premium has not been paid when due;

b. the policy was obtained through fraud, material misrepresentation or omission of fact, which if known by **us**, would have caused **us** not to issue the policy; or

c. there has been a material change or increase in hazard of the risk.

If **we** cancel this policy for nonpayment of premium, **we** will give **you** notice at least 10 days before cancellation is effective. Otherwise, **we** will give **you** notice at least 30 days in advance of cancellation or nonrenewal.

**Your** return premium, if any, will be refunded at the time of cancellation or as soon as practical. Payment or tender of the unearned premium is not a condition of cancellation.

5. **Change, Modification, or Waiver of Policy Terms** — A waiver or change of the **terms** of this policy must be issued by **us** in writing to be valid. If, in the policy period, **we** adopt a revision which broadens coverage without an additional premium, the broadened coverage will apply.

**Our** request for an appraisal or examination under oath does not waive policy **terms**.

If this policy has no expiration date, **we** may substitute or **we** may add, at each anniversary date, forms that are then authorized for use.

6. **Conformity With Statute — Terms** in conflict with the laws of the state where the **insured premises** is located are changed to conform to such laws.

7. **Death** — On **your** death, protection on **your** covered property passes to:

a. **your** legal representative; or

b. any other persons having proper, temporary custody of covered property.

8. **Inspection — We** may, but are not required to, inspect **your** property and operations. **Our** inspection or resulting advice or report does not warrant that **your** property or operations are safe or healthful or comply with laws, rules, or regulations.

9. **Misrepresentation, Concealment, or Fraud — We** do not provide coverage if, before or after a loss:

a. **you** or any other insured have willfully concealed or misrepresented:

   1) a material fact or circumstance with respect to this insurance; or
   2) their interests herein; or

b. there has been fraud or false swearing by **you** or any other insured with respect to this insurance or the subject thereof.

10. **Mortgage Clause** — This applies only to coverage on buildings. The word "mortgagee" includes trustee.

a. If a mortgagee is named on the Declarations, a loss payable under Coverages A or B will be paid to the mortgagee and **you**, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

If **we** deny **your** claim, that denial does not apply to a valid claim of the mortgagee, if the mortgagee has:

   1) notified **us** of change in ownership, occupancy, or substantial change in risk of which the mortgagee became aware;
   2) paid the premium due under this policy on demand if **you** neglected to pay the premium; and
   3) submitted a signed, sworn proof of loss within 60 days after receiving notice from **us** if **you** failed to do so.

All **terms** of this policy apply to the mortgagee unless changed by this clause.

10

**EXHIBIT 1**                    15

b. If **we** cancel or do not renew this policy, **we** will notify the mortgagee at least 10 days before the date cancellation or nonrenewal takes effect.

c. If **we** pay the mortgagee for a loss and deny payment to **you**:

1) **we** are subrogated, up to the amount **we** paid for the loss, to all the rights of the mortgagee granted under the mortgage on the property; or

2) at **our** option, **we** may pay to the mortgagee the whole principal on the mortgage plus the accrued interest. In this event, **we** shall receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Subrogation shall not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

11. **No Benefit To Bailee** – Coverage under this policy will not directly or indirectly benefit those who are paid to assume custody of the covered property.

12. **Policy Period** – This policy only covers losses that occur during the policy period.

13. **Recoveries** – This applies if **we** pay for a loss and lost or damaged property is recovered, or payment is made by those responsible for the loss.

a. **You** must inform **us** or **we** must inform **you** if either recovers property or receives pay-ment.

b. Proper costs incurred by either party are paid first.

c. **You** may keep the property. The amount of the claim paid or a lesser amount to which **we** agree, must be returned to **us**.

d. If the claim paid is less than the agreed loss due to a deductible, or other limiting **terms**, the recovery is prorated between **you** and **us** based on the interest of each in the loss.

14. **Safety Glass** – When breakage of glass is covered, **we** pay to replace the damaged glass with safety glazing materials if required by code, ordinance or law.

15. **Secured Party Coverage** – This applies only to coverage on mobile homes and personal property. This entire clause is void unless the name of a secured party is shown on the Declarations. This clause applies only to the interest of a secured party and does not affect **your** rights or duties under the policy.

a. If a secured party is named on the Declara-tions, a loss payable on property subject to the security interest will be paid to the secured party and **you** as interests may appear. If there is more than one security interest in the same property, the order of payment will be the same as their order of priority.

If **we** deny **your** claim, that denial does not apply to a valid claim of a secured party if the secured party has:

1) notified **us** of a change in ownership, occupancy, or substantial change in risk of which the secured party became aware;

2) paid the premium due under this policy on demand if **you** neglected to pay the pre-mium; and

3) submitted a signed, sworn proof of loss within 60 days after receiving notice from **us** if **you** failed to do so.

All **terms** of this policy apply to the secured party unless changed by this clause.

b. If **we** cancel or do not renew this policy, **we** will notify the secured party at least 10 days before the date cancellation or nonrenewal takes effect.

c. If **we** pay the secured party for a loss and deny payment to **you**:

1) **we** are subrogated, up to the amount **we** paid for the loss, to all the rights of the secured party granted under the security agreement; or

11

EXHIBIT 1                                    16

2) at our option, we may pay the secured party the remaining amount due on the security agreement plus the accrued interest. In this event, we shall receive full assignment of the security agreement and securities held as collateral for the agreement.

However, the secured party's interest is not covered for your conversion, embezzlement, or secretion of encumbered property in your possession, unless specifically insured against and premium paid for such.

16. **Subrogation** – If we pay for a loss, we may require that you assign to us the right of recovery up to the amount we pay. We are not liable for a loss if, after the loss, you impair our right to recover against others. You may waive your right to recover, in writing, before a loss occurs, without affecting coverage. If we pay a loss to or for you and you recover from another party for the same loss, you must pay us as stated in Recoveries.

17. **Suit Against Us** – No suit may be brought against us unless all the terms of this policy have been complied with and the suit is brought within two years after the loss.

17. **Volcanic Action** – All volcanic action that occurs within a 72-hour period constitutes a single occurrence.

---

In Witness Whereof, this Company has executed and attested to these presents; but this policy shall not be valid unless countersigned by an authorized Agent of this Company.

*James R. Sullivan*

President

*Milly Dow Dunn II*

Attorney-in-fact

12

**EXHIBIT 1**                                    17

Book-Page: 161-0624

CERTIFICATE OF RECORD
Filed: 6/22/2009 1:17:54 PM
Pages: 2 (0624-0625)
Official Records of
State of Arkansas
Stone County
Donna Wilson
Circuit Clerk & Recorder

MAIL TAX STATEMENT TO:
Mariah Gayler
Freda Cruse Phillips
P O Box 2133
Mountain View, AR 72560

**WARRANTY DEED**
(Single Person)

By: _Gail D Burnes_ D.C.

KNOW ALL MEN BY THESE PRESENTS:

THAT I, **FREDA CRUSE PHILLIPS**, Single Person and Tenant by the Entirety, for

and in consideration of the sum of ONE DOLLAR AND 00/100 AND OTHER VALUABLE

CONSIDERATION —($1.00 & O.V.C.) — in hand paid by **MARIAH GAYLER**,

GRANTEE, the receipt of which is hereby acknowledged, hereby grant, bargain, sell and convey

unto the said GRANTEE and unto her heirs and assigns forever, subject to the life estate of

**FREDA CRUSE PHILLIPS**, can not be sold, transferred, conveyed or encumbered subject to

the life estate being the following land in Stone County, Arkansas, to-wit:

Part of the NE ¼ SW ¼, Section 12, Township 14 North, Range 12 West, being more
particularly described as follows: Commencing at the SW corner of the NE ¼ SW ¼, thence
N00-00-00E a distance of 111.82 ft to the center of Happy Hollow Road, for the point of
beginning, thence N00-00-00E a distances of 414.17 ft to a point, thence S05-08-48W a distance
of 326.48 feet to the center of Happy Hollow Road, thence with road, S31-03-08W a distance of
14.72 ft to a point, thence leaving Happy Hollow Road along the center of the old Happy Hollow
Road, S49-38-05W a distance of 141.17 ft to the point of beginning, containing 1.15 acres more
or less.

Part of the NW ¼ SW ¼, Section 12, Township 14 North, Range 12 Wet of the Fifth Principal
Meridian, being more particularly described as follows: Commencing at the SE corner of the
NW ¼ SW ¼, thence along the East line thereof, North 224.00 feet to the point of beginning;
thence continue North 280.14 ft to the center of a branch, thence with the branch S 76 deg. 26
min. 35 sec W 80.50 feet; thence N 63 deg. 16 min. 23 sec. W 35.04 feet to the center of a road;
thence with road S 2 deg. 43 min. 20 sec. W 39.77 feet; thence S 10 deg. 4 min. 49 sec. E 126.36
feet; thence leaving road S 54 deg. 39 min. 18 sec. E 107.66 feet to the point of beginning,
containing .56 acres more or less.

To have and to hold the same unto the said GRANTEE, and unto her heirs and assigns

forever, subject only to the life estate of **FREDA CRUSE PHILLIPS**, with all appurtenances

thereunto belonging, including my rights of dower, courtesy and homestead therein.

**EXHIBIT 2**

161-0625

And I hereby covenant with the said GRANTEE that I will forever warrant and defend the title to the said lands against all claims whatever.

WITNESS my hand and seal on this _22_ day of _June_ 2009

_(signature)_

**FREDA CRUSE PHILLIPS**

I certify under penalty of false swearing that at least the legally correct amount of documentary stamps have been placed on this instrument.

Agent _(signature)_

Address _POB 2133 MV 72560_

**ACKNOWLEDGEMENT**

STATE OF ARKANSAS

COUNTY OF STONE

On this the _22_ day of _June_, 2009, before me, a Notary Public, the undersigned officer, personally appeared, **FREDA CRUSE PHILLIPS**, known to me to be the person whose name was subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal.

_(signature)_

NOTARY PUBLIC

My Commission Expires:

_Sept. 01, 2018_

_(Notary seal: KRISTIE BROYLES / NOTARY PUBLIC / STONE CO. ARKANSAS)_

**EXHIBIT 2**

# CIVIL DOCKET

CASE NO. CV2012-94-2

| No. of Case | NAME OF PARTIES | ATTORNEYS | KIND OF ACTION | DATE OF FILING | | |
|---|---|---|---|---|---|---|
| | | | | Month | Day | Year |
| CV202-94-2 | Mariah Gayler and Freda Crush Phillips vs. M Dow Insurance Company | Kim Kelley  Plaintiff | IS | 10  Jury Fees $  Paid by | 12 | 2012 |
| | | | | | | |
| | | | | Defendant | | |

| Date of Orders | ORDERS OF COURT | BOOK | | Process Services, Etc. |
|---|---|---|---|---|
| | | Vol. | Page | |
| 10-12-2012 | Complaint | | | |
| 10-12-2012 | Summons; By Kim Kelley; M Dow Insurance Company; | | | |

11/13/2012  18:59   8702692383

11/15/2012  THU  11:43  [TX/RX

DONNA WILSON STONE C

IN THE CIRCUIT COURT OF STONE COUNTY, ARKANSAS
SECOND DIVISION

MARIAH GAYLER and
FREDA CRUSE PHILLIPS                                         PLAINTIFFS

V.                           NO. CV-2012-94-2
**(Removal to USDC for the Eastern District of Arkansas, Northern Division)**

MDOW INSURANCE COMPANY                                  DEFENDANT

<u>MDOW INSURANCE COMPANY'S NOTICE OF REMOVAL</u>

Please take notice that on the 15th day of November, 2012, a Notice of
Removal was filed in the United States District Court, Eastern District of
Arkansas, Northern Division.   A copy of said Notice of Removal is attached
hereto and made a part hereof.

MUNSON, ROWLETT, MOORE AND
BOONE, P.A.
REGIONS CENTER
400 W. CAPITOL, SUITE 1900
LITTLE ROCK, AR 72201
501/374-6535
mark.breeding@hmrmlaw.com

BY: _____
MARK S. BREEDING    89149

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing Notice of Removal was forwarded this
15 day of November, 2012, to:

Kim Kelley
Kim Kelley P.A.
104 N. Third Street
Heber Springs, AR 72543

_____
MARK S. BREEDING

